IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 13-298 |
| | ) | |
| ASIA M. HARRIS | ) | |

OPINION

DIAMOND, D.J.

On November 12, 2013, the grand jury returned a two-count indictment against defendant Asia M. Harris ("defendant") charging her with the following: making a false statement during the purchase of a firearm on or about August 16, 2011, in violation of 18 U.S.C. §922(a)(6) (Count One); and aiding and abetting the possession of a firearm by a convicted felon from on or about August 16, 2011, to on or about October 16, 2013, in violation of 18 U.S.C. §§922(g)(1) and 2(a) (Count Two).

Defendant filed a Motion to Suppress Statements (Document No. 23), in which she argues that statements she made to agents of the FBI and the Allegheny County Police should be suppressed because they were obtained in the absence of a knowing, intelligent and voluntary waiver of her rights under the Fifth and Fourteenth Amendments. The government subsequently filed its Response to defendant's Motion to Suppress (Document No. 25), and a hearing on this matter was held on April 9, 2014. After considering the evidence presented at the hearing and the arguments of counsel, defendant's suppression motion will be denied for the reasons explained below.

I. **Background**

At the suppression hearing, the government presented the testimony of Detectives Brett Wittenberger and Jonathan Love of the Allegheny County Police and FBI Special Agent Brian Murphy. Defendant testified on her own behalf at the hearing. The evidence received at the hearing establishes the facts that follow.

On October 16, 2013, Detectives Wittenberger and Love, along with other law enforcement agents, executed a search warrant at 96 Stratmore Avenue in Pittsburgh, which is the residence defendant shared with her husband, Mark Brazil. A loaded .40 caliber firearm was found in the master bedroom and a magazine with ten rounds of .40 caliber ammunition was located in a second bedroom.

During the course of the search, Detectives Wittenberger and Love conducted a 15-20 minute interview of defendant on her back porch while other agents interviewed Brazil on the front porch. Both detectives testified that defendant was not restrained or taken into custody and was advised that she was free to leave. In addition, no threats or promises were made to defendant, but she was advised that she could potentially face charges if the information she provided was not truthful.

The detectives explained to defendant that they had recovered the firearm and ammunition, and advised her that Brazil was a convicted felon who was prohibited from owning firearms. Initially, defendant maintained that the gun belonged to her and denied that Brazil had handled it. However, after the detectives told defendant that the firearm would be subject to forensic testing, she told them more about Brazil's involvement with the weapon and admitted that he may have handled it on occasion.

2

After defendant's interview with Detectives Wittenberger and Love, she eventually spoke with Brazil in the living room area of the house. Detective Wittenberger, who was in the living room during that conversation, heard defendant state that she knew Brazil was a convicted felon and that he gave her money and told her to buy the gun.

FBI Agent Murphy testified that he did not participate in the execution of the warrant, but was present at defendant's residence on the morning the search occurred. When Agent Murphy arrived, he observed defendant in the kitchen area and was aware that Detectives Wittenberger and Love already had interviewed her.

Agent Murphy testified that defendant asked to speak with him. Agent Murphy agreed to speak with defendant, but reminded her that she already had been interviewed and advised that he would make a report of anything she discussed with him, which potentially could be used against her. Agent Murphy further advised defendant that she was not under arrest and that she was free to leave if she wished.

The conversation between Agent Murphy and defendant occurred in the kitchen area and lasted approximately 20 minutes. She told Agent Murphy about her background, current employment status and career goal in the area of law enforcement. Defendant also told Agent Murphy how she met Brazil and eventually married him, acknowledged that she knew he was a convicted felon, and indicated she was not pleased that Brazil had involved her in the instant matter.

Agent Murphy reminded defendant that any statements she made to him were voluntary and that she did not have to speak with him, but she continued to talk. Defendant explained to Agent Murphy that she and Brazil drove to Gander Mountain together, she went into the store, took a

3

photograph of the gun, exited the store and showed the photograph to Brazil. Brazil confirmed that was the correct gun and gave defendant $800 to purchase it. Defendant further explained that the gun was purchased in her name, but it was intended for Brazil. Following the search of the residence and the interviews, neither defendant nor Brazil were taken into custody that day.

Defendant's version of her interview with the law enforcement agents differs somewhat from the accounts of Detectives Wittenberger and Love and Agent Murphy. Defendant testified that she felt she had to speak with Detectives Wittenberger and Love and answer their questions, and she did not believe she was free to leave. According to defendant, although Detective Love was fairly professional, he raised his voice when inquiring whether the gun belonged to her. Defendant claimed that she felt pressured by Detective Love, but not by Detective Wittenberger.

Defendant admitted that she did not tell Agent Murphy she felt pressured by Detective Love. Defendant also admitted that Agent Murphy never pressured her in any way, but claimed she did not recall him stating that anything they discussed could be used against her.

The foregoing summary of the suppression hearing testimony reveals somewhat conflicting accounts of the circumstances surrounding the law enforcement agents' interview of defendant. Therefore, the court initially must make a credibility determination of the witnesses who testified at the hearing.

The court, as finder of fact, is free to accept or reject any part or all of a witness's testimony. United States v. Conley, 859 F.Supp. 830, 840 (W.D.Pa. 1994). Credibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either

4

supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic.

With these concepts in mind, the court credits the testimony of Detectives Wittenberger and Love and Agent Murphy and finds defendant's testimony was not entirely credible. First, defendant's testimony that she felt she had to speak with the detectives and was not free to leave is contradicted by the testimony of the law enforcement agents. Detectives Wittenberger and Love exhibited no hesitancy in their recollection of the events that occurred when the warrant was executed at defendant's residence, and their testimony was consistent concerning the circumstances of their interview of defendant. Both detectives credibly testified that defendant was not restrained, she was advised she was free to leave and no threats or promises were made to her. In addition, despite now claiming that she apparently felt pressured to speak with the detectives, defendant admitted that she did not convey this information to Agent Murphy, with whom she requested to speak. For these reasons, as well as defendant's obvious and substantial stake in the outcome of this matter, we do not find her testimony to be fully credible.

## II. Defendant's Motion to Suppress Statements

Defendant was not given a Miranda warning prior to being interviewed by Detectives Wittenberger and Love or prior to speaking with Agent Murphy. The government argues that no Miranda warning was necessary because defendant was not in custody or restrained in any way. Moreover, the government contends that defendant's statements were knowing and voluntary. Contrary to the government's position, defendant claims that she was in custody when she was interviewed by law enforcement and that her statements otherwise were not voluntary, thus the

5

statements should be suppressed because they were obtained in violation of her Fifth and Fourteenth Amendment rights.

Before police can initiate custodial interrogation, they must advise the defendant of certain rights, including the right to remain silent and the right to counsel. See Miranda v. Arizona, 384 U.S. 436, 468-470 (1966). Miranda held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444.

As stated, defendant was not advised of her Miranda rights before she was interviewed by law enforcement agents. Therefore, the issue before the court is whether the recitation of such rights was necessary, *i.e.*, whether defendant was subjected to custodial interrogation at the time she made any allegedly incriminating statements.

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. A person is in custody when he either is formally arrested or his freedom of movement is restricted to "the degree associated with a formal arrest." United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006). The Supreme Court has held that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). Thus, the "in custody" determination for Miranda purposes depends on whether, under the totality of the circumstances, a reasonable person would have felt he was not at liberty to terminate the interrogation and leave. Thompson v.

6

Keohane, 516 U.S. 99, 112 (1995).

Where an individual has not been formally arrested when the statements are made, "something must be said or done by authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974).

"Custodial interrogation" is not susceptible of an exact definition; thus, the determination of whether statements are the product of custodial interrogation must be made on a case-by-case basis. United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999). The Third Circuit has identified a variety of factors for courts to consider when determining if a person is in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. Willaman, 437 F.3d at 359-60. "When a person is questioned on his own turf, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." Id. at 360 (quoting United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004)).

Here, the court finds that defendant was not in custody when she was interviewed by Detectives Wittenberger and Love and subsequently when she spoke with FBI Agent Murphy following execution of the search warrant at her residence. Even though defendant now claims that she felt she was required to speak with Detectives Wittenberger and Love and answer their questions, and she did not believe she was free to leave, her subjective view does not control.

7

Rather, the in custody determination depends on the objective circumstances of the interrogation, see Stansbury, 511 U.S. at 323, meaning whether a reasonable person in defendant's position would have felt free to terminate the interview and leave under the totality of the circumstances.

Under the totality of the circumstances present here, a reasonable person would have felt free to do just that. Consideration of the Willaman factors leads the court to conclude that defendant was not in custody when she was interviewed by Detectives Wittenberger and Love. The interview was conducted on the back porch of defendant's residence and lasted approximately 15-20 minutes. The detectives did not physically restrain defendant during the interview, they advised her that she was free to leave, and there is no indication that they used a hostile tone of voice[1] or displayed weapons.

In addition, defendant asked to speak with Agent Murphy and their conversation, which lasted approximately 20 minutes, occurred in the kitchen area of her residence. Agent Murphy advised defendant that he would make a report of anything she discussed with him and that information potentially could be used against her. Agent Murphy also advised defendant that she was not under arrest and was free to leave if she wished. Nothing in the record indicates that Agent Murphy restrained defendant, used a hostile tone of voice or displayed a weapon when they spoke. Indeed, defendant admitted that Agent Murphy never pressured her in any way. For these reasons, as well as those discussed above, the court finds that defendant was not in custody when she spoke with Agent Murphy, nor was she in custody when Detectives Wittenberger and Love interviewed her, thus no Miranda warning was required.

---

[1] Although defendant testified that Detective Love raised his voice when inquiring whether the gun belonged to her, she also admitted that he was fairly professional, and she never told Agent Murphy that she purportedly felt pressured by Detective Love.

8

Even absent a Miranda violation, the court still must determine whether defendant's statements otherwise were voluntary. A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." Arizona v. Fulminante, 499 U.S. 279, 288 (1991). Whether a statement is voluntarily made is determined from "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

Relevant factors to consider in evaluating voluntariness include not only the crucial element of police coercion, but also may include the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental health. See Colorado v. Connelly, 479 U.S. 157, 167 (1986); Withrow v. Williams, 507 U.S. 680, 693 (1993). The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986).

The government has the burden of establishing, by a preponderance of the evidence, that the challenged statements were voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972); Miller, 796 F.2d at 604. Considering the totality of the circumstances here, the court concludes that the government has satisfied its burden of establishing that defendant's statements to the law enforcement agents were voluntary. Defendant's interview with Detectives Wittenberger and Love, which lasted approximately 15-20 minutes, was conducted on her back porch and there is no indication that she was restrained, threatened or coerced in any manner. Defendant's conversation with Agent Murphy, which she asked to initiate, lasted approximately 20 minutes and defendant

AO 72
(Rev. 8/82)

admitted that she did not feel pressured by him. At the time defendant was interviewed, she was 34 years old, with a high school education, plus some college and business school. In addition, when defendant testified at the suppression hearing, the court observed that she was at least of average intelligence and had no difficulties understanding or responding to the questions posed to her. There is nothing in the record indicating that defendant's age, educational background, intelligence, physical condition or mental condition in any way limited her ability to voluntarily speak to the law enforcement agents. Under these circumstances, the court finds that defendant's statements to Detectives Wittenberger and Love and Agent Murphy were voluntary.

### III. Conclusion

For the foregoing reasons, defendant's Motion to Suppress Statements will be denied. An appropriate order will follow.

*/s/ Gustave Diamond*
Gustave Diamond
United States District Judge

Date: May 28, 2014

cc: Margaret E. Picking
    Assistant U.S. Attorney

    David J. DeFazio, Esq.
    Law Office of David J. DeFazio
    3945 Forbes Avenue, #437
    Pittsburgh, PA 15213

AO 72
(Rev. 8/82)